Don ATER, Plaintiff–Appellant,

v.

David ARMSTRONG and Leon E. Jones, Sr., Defendants–Appellees.

No. 90–5424.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 8, 1990.

Decided April 17, 1992.

Rehearing En Banc Denied June 26, 1992.

---

David A. Friedman (Argued and Briefed), American Civ. Liberties Union of Kentucky, Louisville, Ky., Samuel Hunt Fritschner, Hendersonville, N.C., for plaintiff-appellant.

Stuart L. Adams, Jr. (Argued and Briefed), Rich, Adams, Sisney & D'Ambrosio, Corp. Center, Louisville, Ky., for defendants-appellees.

Before: MILBURN, Circuit Judge; and BROWN and KRUPANSKY, Senior Circuit Judges.

BAILEY BROWN, Senior Circuit Judge.

Plaintiff, Don Ater ("Ater"), appeals from the district court's grant of summary judgment in favor of Defendants, David Armstrong, Jefferson County, Kentucky Judge/Executive, and Leon E. Jones, Sr., Jefferson County Police Chief.[1] Ater, a Grand Dragon of the Realm of the Kentucky Invisible Empire, Knights of the Ku Klux Klan, sought to distribute political literature while standing on medians or on Jefferson County, Kentucky roadways. Bobby Crouch, who was then Jefferson County Police Chief, denied permission for such distribution under Kentucky Revised

---

1. Armstrong and Jones were substituted for Harvey Sloane and Bobby Crouch, who respectively held the positions of Jefferson County Judge/Executive and Police Chief at the time Ater filed his complaint. Ater sued these defendants in their official capacities, which is tantamount to suing Jefferson County itself. *See Brandon v. Holt,* 469 U.S. 464, 471–72, 105 S.Ct. 873, 877–78, 83 L.Ed.2d 878 (1985).

Statutes ("KRS") section 189.570, and Ater sued, challenging the constitutionality of the statute as interpreted. For the reasons that follow, we affirm the district court's grant of Defendants' motion for summary judgment on this issue.

## I

During 1987, Ater sought to distribute political literature while standing on medians or on Jefferson County, Kentucky roadways. Where there was no median, Ater planned to use flashing warning lights. Ater sought permission from then Jefferson County Police Chief Bobby Crouch ("Crouch"). On June 30, 1987, Crouch notified Ater that KRS 189.570 prohibited the proposed conduct. Ater contends that then Jefferson County Judge/Executive Harvey Sloane participated in the interpretation of the statute.

As interpreted, KRS 189.570 generally prohibits persons from standing in the roadways, including the medians. Subsection 21, however, carves out an exception to this rule:

> No person shall stand on the highway for the purpose of soliciting contributions unless such soliciting is designated by the presence of a traffic control device or warning signal or an emergency vehicle or public safety vehicle as defined in KRS 189.910 making use of the flashing, rotating or oscillating red, blue or yellow lights on such devices or vehicles.

KRS 189.570(21).

During November of 1987, Ater sued Crouch and Sloane in their official capacities, seeking declaratory and injunctive relief under 42 U.S.C. § 1983. He claimed that Defendants' interpretation and application of the statute violated his speech and association rights guaranteed by the First and Fourteenth Amendments.

Ater moved for partial summary judgment, and the district court denied his motion on November 28, 1989. The district court stated:

When this statute is read in its entirety, it is clear that the legislature chose to have only one exception [i.e., to solicit contributions]. Pedestrians are restricted to the sidewalk if it is available; if not, then to the shoulder. If no shoulder, they must remain as far as practicable from the edge of the road. It seems logical therefore that the statute prohibits standing or walking on the median to distribute literature.[2]

The district court held that the statute is a content-neutral restriction on speech because the exception, which allows the solicitation of contributions but not the distribution of literature, "is based on the type of activity, not the content or view of the speech." It further determined that the prohibition is narrowly tailored to serve a significant government interest and that it leaves open ample alternative channels of communication. The district court concluded, based upon these determinations, that the prohibition did not violate Ater's rights under the First and Fourteenth Amendments.

In response to the district court's denial of Ater's motion for partial summary judgment, Defendants moved for partial summary judgment. The district court granted this motion for the same reasons it denied Ater's motion. Ater voluntarily dismissed with prejudice his remaining claim of selective enforcement and now appeals from the final order of the district court.

## II

The issues on appeal may be succinctly framed. No party denies that the distribution of literature is speech protected by the First and Fourteenth Amendments. Defendants contend that the statute imposes a reasonable time, place, and manner restriction that is content neutral, is narrowly tailored to serve a significant government interest, and leaves open ample alternative channels of communication. *See Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989). In response, Ater contends that the

---

**2.** It was part of Ater's contention that, properly interpreted, the statute did not apply to the distribution of literature while standing on a median.

prohibition is a content-based restriction that is neither necessary to serve a compelling state interest nor narrowly drawn to achieve that end. *See Frisby v. Schultz,* 487 U.S. 474, 481, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988). Alternatively, Ater contends that even if the prohibition were content neutral, it is not narrowly tailored to serve the state's legitimate interest in highway safety.

### A

■ We first briefly discuss the nature of the forum at issue. There can be no doubt that the streets of Jefferson County, Kentucky, are traditional public fora. "No particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora." *Frisby,* 487 U.S. at 481, 108 S.Ct. at 2500. The government's ability to restrict expressive conduct in traditional public fora is quite limited. *See United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983).

It is equally clear, however, that the government may impose reasonable time, place, and manner restrictions on protected conduct, even in traditional public fora. Such restrictions comport with the strictures of the First Amendment so long as they (1) are justified without reference to the content of the speech (content neutrality), (2) are narrowly tailored to serve a significant governmental interest, and (3) leave open ample alternative channels for communication of the information. *Rock Against Racism,* 491 U.S. at 791, 109 S.Ct. at 2753. Because Ater concedes the existence of ample alternative channels for communication, the remainder of this opinion is concerned with the first two requirements of the above standard.

### B

Ater first contests the district court's conclusion that the prohibition is content neutral. The Supreme Court has held that, to be content neutral, a restriction " 'may not be based upon either the content or subject matter of [the] speech.' " *Heffron v. Int'l Soc. of Krishna Consc.,* 452 U.S. 640, 648, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981) (quoting *Consolidated Edison Co. v. Public Service Comm'n,* 447 U.S. 530, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980)). The central inquiry with respect to content neutrality is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys," *Bamon Corp. v. City of Dayton,* 923 F.2d 470, 473 (6th Cir.1991) (citation omitted), or because of a desire to suppress information. The restriction must apply "even-handedly to all who wish to distribute and sell written materials or to solicit funds." *Heffron,* 452 U.S. at 649, 101 S.Ct. at 2564. The restriction, moreover, must not "suffer from the more covert forms of discrimination that may result when arbitrary discretion is vested in some governmental authority." *Id.*

■ The Kentucky statute, KRS 189.570, is content neutral on its face. Because the statute prohibits *all* parties from distributing literature in the roadways, and because it permits *all* parties to solicit contributions in the roadways if the precautions prescribed by subsection 21 are undertaken, the statute applies evenhandedly to all those who wish to distribute written materials or solicit funds. For example, both the Ku Klux Klan and the NAACP are barred from distributing their literature to motorists, regardless of their diverse viewpoints or the informational content of their messages. Both organizations, however, could solicit for contributions, provided that each meets the safety requirements set forth in subsection 21 of the statute.

Ater contends, however, that the local officials designated the individuals who have been allowed access to Kentucky's roadways. This selective designation, Ater contends, is based on the content of the message. We disagree. The statute does not vest the officials with such arbitrary discretion. The statute, as interpreted and applied, provides that *all* parties are prohibited from disseminating literature but, provided the lighting safeguards of subsection 21 are met, are permitted to solicit contributions. The county officials' inter-

**1228**

pretation and application of the statute, therefore, were not based on the content of Ater's message.[3]

Ater also contends that a recent opinion of this court undercuts the content-neutral characterization of Kentucky's disparate treatment of distribution of literature and solicitation for contributions. *See Discovery Network v. Cincinnati,* 946 F.2d 464, 471–72 (6th Cir.1991). In *Discovery Network,* we concluded that a Cincinnati ordinance prohibiting the newsrack distribution of "commercial" publications (such as magazines listing real estate for sale), but allowing such distribution of "non-commercial" publications (which had been interpreted and applied to cover newspapers), was a content-based restriction that violated the First Amendment as incorporated by the Fourteenth Amendment. "The ordinance treats newsracks differently on the basis of the commercial content of the publications distributed." *Discovery Network,* at 472.

In contrast, the Kentucky statute that Ater challenges is content neutral. It is aimed at the noncommunicative impact of the conduct (the creation of unsafe conditions on Kentucky's roadways); it is not motivated by a governmental intent to suppress ideas or information. The ordinance at issue in *Discovery Network* was facially aimed at the suppression of a particular type of information: that contained in

"commercial" publications. The Kentucky statute does not suffer from such a defect.

 The solicitation of money and the distribution of literature are two different categories of speech, each of which enjoys protection under the First Amendment. *See Heffron,* 452 U.S. at 647, 101 S.Ct. at 2563. As this court recently noted:

"A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some … messages but not others." (Citation omitted). Regulations that apply to a particular category of speech because the regulatory targets happen to be associated with that type of speech are properly characterized as content-neutral, as long as the regulations are justified without reference to the content of that speech.

*Bamon Corp. v. City of Dayton,* 923 F.2d 470, 473 (6th Cir.1991) (citing *Boos v. Barry,* 485 U.S. 312, 320, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988)). The goal of the Kentucky statute is to promote public safety in the roadways. The officials' application of the statute was not based on the content of any message.

Finally, the Supreme Court recently discussed a regulation that prohibited solicitation but allowed other expressive conduct. It held that "[c]learly, the regulation does not discriminate on the basis of content or viewpoint." *United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 3124, 111 L.Ed.2d 571 (1990).[4] Similarly, the Ken-

3. We note that, although Ater contended below that the statute did not bar the conduct he proposed and that the statute was selectively enforced, he expressly abandoned both of those contentions on this appeal.

4. The dissent cites *United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), for the proposition that solicitation presents a greater traffic and safety hazard than distribution of literature. It fails to note that, in *Kokinda,* five members of the Supreme Court concluded that a content-neutral distinction could be made between solicitation and distribution of literature. In *Kokinda,* the Postal Service barred solicitation on its sidewalks because of its desire to facilitate customers' postal transactions. *See Kokinda,* 110 S.Ct. at 3124. Similarly, the Kentucky statute bars most expressive conduct because of Kentucky's desire to provide safe and uncongested roadways. In *Kokinda,*

the failure of the Postal Service to bar other forms of expressive conduct did not lead to the conclusion that the regulation was content based. Similarly, Kentucky's failure to bar solicitation does not support the dissent's erroneous conclusion that the statute, as interpreted and applied, is content based.

It is unclear why the Kentucky statute excepts solicitation from the general prohibition of pedestrian activities upon its roads. But it absolutely defies reason to hold that Kentucky excepted solicitation because it wished to suppress certain ideas, information, viewpoints, or otherwise impose a content-based restriction on speech. Because anyone, from the Ku Klux Klan to the NAACP, may solicit but no one may undertake other expressive conduct in Kentucky's roads, the exception leaves all content on equal footing. A content-based motive cannot be logically inferred from this exception.

tucky statute, which allows solicitation but prohibits other expressive conduct, does not discriminate on the basis of content or viewpoint. Thus, the district court correctly concluded that the statute imposes a content-neutral restriction on speech.

C

█ Ater also argues that the statute is not narrowly tailored to serve a significant governmental interest. Although he concedes Kentucky's legitimate interest in the safe and orderly flow of traffic on its roadways, Ater argues that the statute "is so broad in its sweep as to infringe upon speech unrelated to the identified purpose." He also argues that "the *Discovery Network* court's analysis of the 'reasonable fit' between Cincinnati's asserted ends and its chosen means ... is analogous to Ater's argument...."

In *Discovery Network*, we cited *Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661, for the proposition that a time, place, and manner restriction of speech must be narrowly tailored. *Discovery Network*, 946 F.2d at 473 n. 14. *Rock Against Racism* supports the conclusion that the Kentucky statute challenged by Ater, which arguably is underinclusive because it allows the solicitation of funds, meets this requirement:

> So long as the means chosen are not substantially *broader* than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative. "The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests" or the degree to which those interests should be promoted.

*Rock Against Racism*, 491 U.S. at 800, 109 S.Ct. at 2758 (emphasis added) (alteration in original) (quoting *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985)).

The district court held, and we agree, that the Kentucky statute is intended to promote the legitimate goal of safety in the roadways. By prohibiting the distribution of literature in the roadways, the statute eliminates no *more* activity than was considered necessary. Kentucky's legitimate interest in safety would support the prohibition of all pedestrian activities on its roadways, even the solicitation of funds, which it has chosen to except from the prohibition. For this reason, we agree with the district court's conclusion that the statute's failure to prohibit solicitation of funds in the roadways does not render it unconstitutional. *See Rock Against Racism*, 491 U.S. at 800, 109 S.Ct. at 2758; *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 215, 95 S.Ct. 2268, 2275, 45 L.Ed.2d 125 (1975) (problems of underinclusiveness are rarely problems of constitutional magnitude, unless they signify an impermissible discriminatory motive). Although we might question the wisdom of excepting solicitation from the general prohibition, our questions relate to the degree and method that Kentucky has chosen for the promotion of its legitimate interest in safe and uncongested roads.

█ The dissent contends that the underinclusiveness of the statute raises serious doubts about its true objective and renders it impossible to determine whether the statute targets no more than the source of the evil it seeks to remedy. The Supreme Court has shown great reluctance to make First Amendment-related speculations on the hidden motives of legislative bodies. *See United States v. O'Brien*, 391 U.S. 367, 383–84, 88 S.Ct. 1673, 1682–83, 20 L.Ed.2d 672 (1968). Although this statute presents an underinclusive remedy, it clearly serves the state's interest in avoiding traffic congestion and fostering road safety. It cannot be doubted that Kentucky has the power to limit pedestrian activities upon its roadways. We cannot believe, as the dissent apparently would have us hold, that Kentucky prohibited nearly all forms of pedestrian activity upon its roads, excepting only solicitation, because it wished

to censor expression. Its reason clearly was safety.[5]

### D

The district court also correctly found that there are ample alternative channels of communication, a determination that Ater does not dispute.

### III

Because we hold that the statute is not an unconstitutional restriction on Ater's speech, we AFFIRM the district court's grant of summary judgment in favor of the defendants.

KRUPANSKY, Senior Circuit Judge, dissenting.

The single justification for endorsing the constitutional validity of subsection (21) of Kentucky Revised Statute (KRS) section 189.570 and its regulation of first amendment rights of free expression in a public forum hangs on the fragile thread of its articulated purpose of promoting a significant public interest, in this case, the protec-

tion of motorists and pedestrians from the hazards inherent to their interacting activities while jointly using the roadways of Kentucky. *Absent that justification, the constitutional challenge to section (21) as an infringement of first amendment rights to free expression in a public forum must prevail.*[1]

Recognizing the lesser burden of the state to support the constitutionality of a statute that is *content neutral* as compared to the greater burden of proof imposed upon the state to sustain the constitutionality of a *content-based* statute, *the state is nevertheless burdened to prove* that even a content neutral statute regulating first amendment rights of free expression in a public forum must be anchored in proof of the state's intention to protect *a significant state interest.* In the instant case, that *significant interest* is the protection of motorists and pedestrians from the safety hazards arising from their joint interrelated activities while using Kentucky's roadways.

The paradox of subsection (21) and its asserted justification to promote a *signifi-*

---

**5.** The dissent would require a legitimate government interest that justifies the exception of solicitation from the general proscription of pedestrian activity on the roads. The legitimate government interest need only justify the general prohibition of protected activity; so long as its distinctions are content neutral, it need not justify the allowance of some expression. The government's interest in safety and the avoidance of traffic congestion adequately supports the statute's prohibition of pedestrian activities on Kentucky's roads. Unless a prohibition is content based, we examine the legislature's motive for prohibiting the forms of conduct it chooses to prohibit, not its motive for excepting other forms of conduct from the prohibition.

**1.** The parties and the panel majority are in accord that the public forum here in controversy, i.e., the active roadways of Kentucky, is one which "by long tradition or by government fiat ha[s] been devoted to assembly and debate," *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983), and as public streets and roadways "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939). Accordingly, it is within this agreed

context that the dissent addresses this appellate review.

Although not joined as an issue in this appeal, the character of the forum to which plaintiff seeks access appears to present an area of interesting academic inquiry. It is difficult to envision today's interstate high-speed highways, three, four, or more laned heavily traveled county and municipal roadways, and streets congested with moving vehicular traffic, all of which are embraced within the broad language of KRS section 189.570, as public streets that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Pragmatically, the forum to which plaintiff seeks access would more appropriately be characterized as a non-public forum similar to, but more hazardous than, that which is described in *United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 3122, 111 L.Ed.2d 571 (1990). As a non-public forum, the standard for determining regulatory compliance with the First Amendment would be reduced to one of *reasonableness.* Section (21) of KRS 189.570 would obviously fail to satisfy that standard since it permits the most hazardous activity, solicitation of monetary contributions, to the exclusion of the less hazardous oral, visual, or written advocacy.

*cant public interest* is reflected by the state's obvious intent to condone a convenient *but more hazardous* activity in the form of pedestrian solicitations seeking instant monetary contributions from motorists momentarily stopped at heavily traveled intersections controlled by mechanical traffic signals to the exclusion of *less hazardous* traditional forms of oral, visual, or written solicitations seeking future monetary contributions, enrollment and/or membership in special interest organizations, endorsements of political, religious, or other expressions of special interest advocacy from those same motorists under identical circumstances.

The absurdity posed by this unanswerable dilemma that ignores logic and commonsense has been avoided by the panel majority's disposition.

Because a solicitation, in whatever form, be it oral, visual, or written, is defined as merely an approach with a request or plea; a move to action; a petition to entreat or importune; an urge or incentive; an endeavor to obtain by pleading; or an inducement,[2] and because existing judicial precedent including current Supreme Court pronouncements make *no distinction* between personal solicitations seeking *instant* monetary contributions and other traditional forms of oral, visual, or written solicitations seeking *future* monetary contributions, enrollment and/or membership in special interest organizations, endorsement of political, religious, or other expressions of special interest advocacy within a public forum except distinctions of the type posed by the factual circumstances of the instant action, namely the *degree* of the safety

hazard posed by the various methods employed to implement the solicitation, coupled with the panel majority's refusal to address the inconsistency of subsection (21) and for the reasons more fully discussed herein, I must respectfully dissent.

As the panel majority has already stated, the plaintiff, Don Ater, has appealed from the grant of summary judgment in favor of the defendants, David Armstrong and Leon E. Jones, Sr., the Jefferson County executive/judge and Jefferson County police chief, respectively (Jefferson County).[3] Ater sought declaratory and injunctive relief in this action challenging the validity of a subsection of KRS section 189.570, a traffic statute that regulates pedestrians in their limited use of Kentucky's highways, roadways, and streets and which *prohibits all* pedestrian activity except the solicitation of monetary contributions while employing "a traffic control device or warning signal or an emergency vehicle as defined in KRS section 189.910 (fire engines, police cars, etc.) making use of the rotating, flashing, or oscillating red, blue, or yellow lights on such devices or vehicles," KRS 189.570(21), while in and upon the highways, roadways, and streets in Kentucky.[4]

More specifically, the plaintiff has challenged the constitutionality of subsection (21) of the enactment, which bars the distribution of literature and all other expressions of speech *except* the solicitation of monetary contributions on Kentucky's roadways when conducted with a "traffic control device or warning signal or an emergency vehicle or public safety vehicle as defined in KRS 189.910 making use of the flashing, rotating, ·or oscillating red,

---

**2.** *See Webster's Third New International Dictionary* 2169 (1981).

**3.** After Ater had moved for partial summary judgment, which was denied on November 28, 1989, Jefferson County moved for partial summary judgment, which was granted on February 22, 1990 because it joined the same issues as those joined by Ater in his motion. The only remaining issue was Ater's claim of selective enforcement of the statute, which was dismissed with prejudice pursuant to the parties' consent. Fed.R.Civ.P. 41(a).

**4.** KRS section 189.570 has not been accompanied by legislative history. In addition, the

First Amendment applications of the statute have not been addressed by the Kentucky Supreme Court. The courts of Kentucky have interpreted this statute within the limited context of a pedestrian's duty to exercise due care while using the public roadways. *See, e.g., Seymour v. State Farm Mutual Insurance Co.,* 508 S.W.2d 572 (Ky.1974); *Ellis v. Quinker,* 674 S.W.2d 34 (Ky.Ct.App.1984). Therefore, in accordance with accepted standards of statutory construction, this court is confined to the words of the statute in deriving the intent and purpose of its enactment.

blue, or yellow lights or such devices or vehicles." Subsection (21) provides:

No person shall stand on a highway for the purpose of soliciting contributions unless such soliciting is designated by the presence of a traffic control device or warning signal or an emergency vehicle or public safety vehicle as defined in KRS 189.910 making use of the flashing, rotating or oscillating red, blue, or yellow lights on such devices or vehicles.

KRS § 189.570(21) (Banks–Baldwin 1987).

In the complaint, Ater asserted that subsection (21) is a content-based restriction that is neither necessary to serve a compelling state interest nor narrowly drawn to achieve that end; that even if it were content neutral, it is not narrowly tailored to serve the state's legitimate interest in highway safety. He argued that subsection (21), although having the appearance of "content neutrality," its enforcement effectively converted it into "content-based" legislation with an "impermissible discriminatory motive" calculated to censor expressive activity in a public forum. Plaintiff, accordingly, has charged first and fourteenth constitutional infringements of freedom of expression.

The thrust and scope of the legislative limitation imposed upon pedestrian activity and movement upon the state's roadways is more accurately reflected by the statute when it is considered in its entirety.[5]

The parties do not dispute the dispositive facts of the instant controversy. Ater, a Grand Dragon of the Realm of Kentucky Invisible Empire, Knights of the Ku Klux Klan, sought permission from Bobby Crouch, then the chief of police of Jefferson County, Kentucky, to distribute Ku Klux Klan literature while standing in the roadways of Jefferson County. He proposed to distribute the literature to motorists while using the designated flashing, rotating, or oscillating red, blue, or yellow warning lights generally used by emergency or public safety vehicles as prescribed by KRS 189.570. In a letter dated June 9, 1987, Couch advised Ater that his proposed

5. 189.570 Pedestrians

 (1) Pedestrians shall obey the instruction of any official traffic control devices specifically applicable to them, unless otherwise directed by a police officer or other officially designated persons.

 (2) Pedestrians shall be subject to traffic and *pedestrian control signals* as provided in KRS 189.231 and 189.338.

 (3) At all other places, pedestrians shall be accorded the privileges and shall be subject to the restrictions stated in this chapter.

 ....

 (8) The operator of a vehicle shall yield the right of way to any pedestrian on a sidewalk.

 (9) No pedestrian shall suddenly leave a curb or other place of safety and walk or run into the path of vehicle which is so close as to constitute an immediate hazard.

 (10) No pedestrian shall cross a roadway intersection diagonally unless authorized by official traffic control devices; and, when authorized to cross diagonally, pedestrians shall cross only in accordance with the official traffic control devices pertaining to such crossing movements.

 (11) Pedestrians shall move, whenever practicable, upon the right half of crosswalks.

 (12) Where a sidewalk is provided and its use is practicable, it shall be unlawful for any pedestrian to walk along and upon an adjacent roadway.

 (13) Where a sidewalk is not available, any pedestrian walking along and upon a *highway* shall walk only on a shoulder, as far as practicable from the edge of the roadway.

 (14) Where neither a sidewalk nor a shoulder is available, any pedestrian walking on or along a *highway* shall walk as near as practicable to an outside edge of the roadway, and, if on a two-way *roadway*, shall walk only on the left side of the roadway.

 (15) Except as otherwise provided in this chapter, any pedestrian upon a *roadway* shall yield the right of way to all vehicles upon the roadway.

 ....

 (19) No person shall stand in a *roadway* for the purpose of soliciting a ride.

 (20) No person shall stand on a *roadway* for the purpose of soliciting employment or business from the occupant of any vehicle.

 (21) No person shall stand on a *highway* for the purpose of soliciting contributions unless such soliciting is designated by the presence of a traffic control device or warning signal or an emergency vehicle or public safety vehicle as defined in KRS 189.910 making use of the flashing, rotating, or oscillating red, blue, or yellow lights on such devices or vehicles.

 (22) No person shall stand on or in proximity to a street or *highway* for the purpose of soliciting the watching or guarding of any vehicle while parked or about to be parked on a *street* or *highway*.

KRS § 189.570 (Banks–Baldwin 1987).

activity was prohibited under KRS 189.570, which "regulates the use of the roadway by the pedestrians and generally prohibits a pedestrian from being in the middle of the road for any reason." In a letter dated June 30, 1987, Couch stated that the statute would be enforced "without favor to any group or person."

In denying Ater's motion for partial summary judgment, the district court concluded that although not explicitly mentioned, the distribution of literature was banned by the statute. According to the district court, *all pedestrian activity*, except appropriately conducted solicitations of monetary contributions, presented potential hazards to the safety of both pedestrians and motorists on Kentucky roadways and were accordingly prohibited:

> When this statute is read in its entirety, it is clear that the legislature chose to have only one exception. Pedestrians are restricted to the sidewalk if it is available; if not, then to the shoulder. If no shoulder, they must remain as far as practicable from the edge of the road. It seems logical therefore that the statute prohibits standing or walking upon the median to distribute literature.

In addition, the district court, and now the panel majority, has decided that the statute was content neutral because the distinction between solicitation of monetary contributions and other forms of solicitation, either visual, oral, or written, in this case, the distribution of literature, was based on the type of activity, not the content or view of the speech.

To justify the constitutionality of subsection (21) of KRS 189.570, the panel majority, in affirming the lower court, reasons that

> [b]ecause the statute prohibits *all* parties from distributing literature in the roadways, and because it permits *all* parties to solicit contributions in the roadways if the precautions prescribed by subsection 21 are undertaken, the statute applies evenhandedly to all those who wish to distribute written materials or solicit funds. For example, both the Ku Klux Klan and the NAACP are barred from

distributing their literature to motorists, regardless of their diverse viewpoints or the informational content of their messages. Both organizations, however, could solicit for contributions provided that each meets the safety requirements set forth in subsection 21 of the statute.

See page 1227.

This conclusory, superficial reasoning is misconceived and ignores the underlying substantive issue urged by the plaintiff. The meaningful distinction which is key to the resolution of the instant controversy is not whether "the statute prohibits *all* parties from distributing literature in the roadways" and/or "permits *all* parties to solicit monetary contributions in the roadway if the parties take the precautions required by KRS 189.570(21)." Rather, the distinction to be resolved within the parameters of the statute, which is anchored in insuring a significant governmental interest in protecting the activities and movement of pedestrians and motorists from the inherently hazardous environment of Kentucky's active roadways, is the difference, if any, between the forms of the solicitation pursued and the dangers inherent to each, i.e., between the activity and movements of pedestrians who solicit by distributing literature and those pedestrians who orally solicit monetary contributions while implementing the lighting precautions imposed by KRS 189.570(21) within the inherently hazardous environment of Kentucky's active roadways. Simply stated, does the written solicitation by distributing literature as compared to word of mouth solicitation of instant monetary contributions within Kentucky's active roadways present a greater or lesser safety hazard that differ so materially as to warrant selective legislative treatment or enforcement when pedestrian-motorist interacting activity and the safety hazards inherent to each is the sole justification for suppressing first amendment rights to free expression.

Although the panel majority has avoided addressing this dispositive distinction, the Supreme Court and those circuits which have considered the issue have uniformly resolved it by balancing the relative con-

tributing safety hazards posed by each activity. The decisions are unanimous and are concisely summarized by the Court's decision in *United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), recently decided in June of 1990, wherein it reaffirmed its then existing precedential pronouncements when it stated:

Solicitation [of contributions] impedes the normal flow of traffic. See *Heffron,* 452 U.S. at 653, 101 S.Ct. at 2566–2567. Solicitation requires action by those who would respond: the individual solicited must decide whether or not to contribute (which might itself involve reading the solicitor's literature or hearing his pitch), and then, having decided to do so, reach for a wallet, search it for money, write a check, or produce a credit card. See Record, Exh. 5 (credit card receipt); see also *United States v. Belsky,* 799 F.2d 1485 (CA11 1986) ("Soliciting funds is an inherently more intrusive and complicat-

ed activity than is distributing literature.").... Justice Blackmun noted this distinction in his opinion concurring in part and dissenting in part to *Heffron:*

"The distribution of literature does not require that the recipient stop in order to receive the message the speaker wishes to convey; instead, the recipient is free to read the message at a later time.... [S]ales and the collection of solicited funds not only require the fairgoer to stop, but also engender additional confusion ... because they involve acts of exchanging articles for money, fumbling for and dropping money, making change, etc."

*Kokinda,* 110 S.Ct. at 3123–24 (quoting *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 665, 101 S.Ct. 2559, 2573, 69 L.Ed.2d 298 (1981) (Blackmun, J., concurring in part and dissenting in part) (citation omitted)).[6]

**6.** The panel majority totally misconceives the legal precedent enunciated by the Supreme Court in *United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), and the substance of this dissent.

Initially, *Kokinda* did not seek to regulate content neutral activity by denying access, as in the instant case, to traditionally *open public fora* such as public streets, parks, roadways, etc., where the government's action is *held to stricter time, place and manner regulation of speech.* Rather, *Kokinda* resulted from a denial of expressive activity by access to a *non-public fora* which had not been dedicated to First Amendment activity. The government's regulation of expressive activity within a non-public fora is examined *only for reasonableness. Kokinda,* 110 S.Ct. at 3118–22. The postal sidewalks in *Kokinda* did not have the characteristics of a public forum traditionally open to expressive activity as in the case confronting this appellate review.

*Heffron v. Int'l Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), directs that "[c]onsideration of a forum's special attributes is relevant to the constitutionality of a [statute] regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved." *Heffron,* 452 U.S. at 650–51, 101 S.Ct. at 2565. The purpose of the forum in the instant case, i.e., Kentucky's roadways, is to afford a *free, uninterrupted* and *safe* flow of motor vehicular traffic. Defendants assert that it is reasonable to restrict access to those roadways if the interaction between pedestrian and vehicular activity is *inherently dangerous.* The

defendants' statement is sound only if the statute is narrowly tailored and targets and eliminates no more than the exact source of the evil it *seeks to remedy:* protecting pedestrians and motorists from the hazards inherent to their interacting activities while using those roadways to insure the free, normal and safe flow of vehicular traffic.

Second, *Kokinda* addressed the comparative intrusiveness of monetary solicitations (selling books, newspaper subscriptions, etc.) with other less intrusive forms of solicitation such as distributing literature and concluded that contribution solicitation was inherently the most intimidating and intrusive form of solicitation and *should be treated differently from alternative forms of solicitation and expression:*

As residents of metropolitan areas know from daily experience, confrontation by a person asking for money disrupts passage and is more intrusive and intimidating than an encounter with a person giving out information. One need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone's hand, but one must listen, comprehend, decide and act in order to respond to a solicitation. Solicitors can achieve their goal only by "stopping [passersby] momentarily or for longer periods as money is given or exchanged for literature" or other items. *Heffron, supra,* 452 U.S., at 653, 101 S.Ct. at 2567 (upholding stringent restrictions on the location of sales and solicitation activity).

\* \* \* \* \* \*

The regulation is premised on the Service's long experience, on the fact that solicitation is

Similarly, in *ACORN v. City of Phoenix*, 798 F.2d 1260, 1269 (9th Cir.1986), the circuit court discussed "the substantial risk of disruption" in traffic control that may be presented by solicitation as opposed to other forms of expression. It noted the testimony of an expert witness at trial that "solicitation from motorists creates a potential safety hazard because the consequent distraction of the drivers poses a significant risk to motorist and pedestrian safety. Distracted drivers are more prone to automobile accidents...." *ACORN*, 798 F.2d at 1270. Thus, solicitation and its attendant distraction of motorist attention not only impede the orderly flow of traffic, but raise serious traffic and public safety concerns. *ACORN*, 798 F.2d at 1269. The court distinguished solicitation from motorists and the hazards it posed from the dangers attendant upon other forms of expression directed towards motorists:

> Unlike oral advocacy of ideas, or even the distribution of literature, successful solicitation requires the individual to respond by searching for currency and passing it along to the solicitor. Even

after the solicitor has departed, the driver must secure any change returned, replace a wallet or close a purse, and then return proper attention to the full responsibilities of a motor vehicle driver. The direct personal solicitation from drivers distracts them from their primary duty to watch the traffic and potential hazards in the road, observe all traffic control signals or warnings, and prepare to move through the intersection.

*ACORN*, 798 F.2d at 1269.

*See United States Labor Party v. Oremus*, 619 F.2d 683, 688 (7th Cir.1980) (recognizing "evident dangers of physical injury and traffic disruption that are present when individuals stand in the center of busy streets trying to engage drivers and solicit contributions from them") (quotations omitted). To permit, as subsection (21) does, the most hazardous form of free expression to the exclusion of all other less hazardous forms of free expression under identical circumstances for the ostensible significant state interest of protecting pedestrians and motorists from the hazards inherent to Kentucky's active roadways is

inherently more disruptive than the other speech activities it permits, and on the Service's empirically based conclusion that a case-by-case approach to regulation of solicitation is unworkable.

*Kokinda*, 110 S.Ct. at 3123–24.

Third, it is true, as the majority states, that five members of the Supreme Court in *Kokinda* concluded that a content-neutral distinction could be made between solicitation of contributions and distribution of literature. However, the majority fails to explain that the limited context within which the Supreme Court addressed the distinction was to identify solicitations of monetary contributions as the most intrusive of all forms of alternate visual, oral or written solicitations, including the distribution of literature. *Kokinda*, 110 S.Ct. at 3124.

Lastly, contrary to the majority's conclusory statement, this dissent does not rely upon *Kokinda* to conclude that subsection (21) of KRS 189.570 should be evaluated under a content based standard. Rather, this dissent relies upon *Kokinda* to illustrate the constitutional necessity for determining the degree of intrusiveness placed upon expressive activities by the various forms of solicitation when a specifically identified form of solicitation is the significant state interest relied upon to prohibit such activity. In *Kokinda*, the Supreme Court evaluated a postal regulation that barred solicitation of contributions rather than distribution of literature. To determine if the regulation met the content

neutral test, the Court considered whether the solicitation of contributions was disruptive of postal business. It concluded that solicitation of contributions was inherently disruptive of postal business and that the Postal Service's prohibition of solicitation of contributions was, accordingly, a valid regulation of expressive activity. The Court avoided any comment on the constitutional validity of a regulation that would deny the lesser intrusive forms of visual, oral, or written solicitation including the distributions of literature. *See Kokinda*, 110 S.Ct. at 3123.

In addition, this dissent relies upon *Kokinda* to illustrate the uniformly accepted conclusion that the solicitation of monetary contributions is one of the most hazardous and disruptive first amendment activities that may be conducted on the roadways and, accordingly, resolves that it is not narrowly tailored to support its purported legitimate state interest in highway safety. Subsection (21) of KRS 189.570 does not meet the *content neutral* test because the statute permits more hazardous activity but prohibits the safer activities. As evident from the above discussion, a content neutral analysis requires the conclusion that the statute is constitutionally infirm. The content based analysis, discussed later in this dissent, rests on entirely different analytic pinnings.

an obvious paradox that is calculated to afford the opportunity to implement an impermissible motive to censor expressive activity in a public forum.

The error of the district court's disposition as adopted by the panel majority is more fully reflected by a review of legal precedent addressing the issues here in controversy, beginning with *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983), in which the Supreme Court distinguished among three types of forums which have been historically available, to some degree, as platforms for freely proselytizing social, religious, political, and other advocacy: the traditional public forum; the forum created by designation; and the non-public forum. A traditional public forum is one which "by long tradition or by government fiat ha[s] been devoted to assembly and debate." *Perry*, 460 U.S. at 45, 103 S.Ct. at 955. Public streets have long been recognized as traditional public forums which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939). *See also Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 2499–2501, 101 L.Ed.2d 420 (1988); *Perry*, 460 U.S. at 45, 103 S.Ct. at 955. There can be no doubt that Ater seeks to engage in protected free speech in a public forum.[7]

The government's ability to restrict free speech in a public forum is severely limited. Public fora represent an area within which intolerance for exhibitions or speech, petition, and assembly is at a minimum, *and the government's burden of justification is at its highest. United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983); *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); *International Society for Krishna Consciousness v. City of Baton Rouge*,

876 F.2d 494, 497 (5th Cir.1989). "The appropriate level of scrutiny is initially tied to whether the statue distinguishes between prohibited and permitted speech on the basis of content." *Frisby*, 108 S.Ct. at 2500. Content-based restrictions will be upheld only if necessary to serve a compelling state interest and narrowly tailored to serve that end. *Frisby*, 108 S.Ct. at 2500 (citing *Perry*, 460 U.S. at 45, 103 S.Ct. at 955). The government may enforce reasonable content neutral regulation of time, place, and manner of speech so long as it is "narrowly tailored to serve a significant government interest, and leave[s] open ample alternative channels of communication." *Perry*, 460 U.S. at 45, 103 S.Ct. at 955.

Ater does not dispute that Kentucky has a legitimate interest in highway safety or that it has a legitimate interest in ensuring highway safety and free, uninterrupted traffic flow. *See Frisby*, 108 S.Ct. at 2499–2501; *Perry*, 460 U.S. at 45, 103 S.Ct. at 955. The Supreme Court has recognized that ensuring highway safety and the orderly flow of traffic justifies reasonable time, place, and manner regulation of freedom of expression. *Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941). "Narrow and reasonable regulation of the exercise of rights designed to keep the streets open and safe for travel is not prohibited by the First Amendment." *United States Labor Party v. Oremus*, 619 F.2d 683, 688 (7th Cir.1980) (citations omitted).

Accordingly, the thrust of plaintiff's initial argument challenges K.R.S. 189.570 subsection (21) because it is not narrowly tailored to serve the state's legitimate interest in highway safety, namely, the protection of motorists and pedestrians interacting within the hazardous environment of heavily-traveled intersecting roadways. *Frisby*, 108 S.Ct. at 2503; *New Jersey Citizen Action v. Edison Twp.*, 797 F.2d 1250, 1256–57 (3rd Cir.1986).

---

7. Ater has standing to challenge the statute, since it "covers [his] particular conduct." *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702,

75 L.Ed.2d 736 (1983). *See also Daily Herald Co. v. Munro*, 838 F.2d 380 (9th Cir.1988).

The instant action, unlike its predecessors in time, does not seek to consider or decide the constitutional validity of facsimile time, place, and manner legislation adopted by other state or local governments designed to regulate freedom of expression by denying access to a traditional public forum for the purpose of ensuring a governmental interest of highway safety and orderly traffic flow. Rather, subsection (21) of KRS 189.570 seeks to selectively deny access to the public forum of Kentucky's roadways by appending to an otherwise constitutionally valid statute, anchored in advancing a significant governmental interest to keep its roadways open and safe for travel, a malignant exception that on its face militates against even-handed application and discriminates against other indistinguishable forms of direct communication including, but not limited to, orally propagated political or special interest views; visual advocacy in placard, banners, etc.; and distribution of literature or other means of petitioning expression while conforming with the safety lighting requirements of the enactment.

The plaintiff is a member of a public advocacy organization that encourages its members to canvass and distribute literature to motorists momentarily stopped by traffic signals at the intersection of Kentucky's roadways. The literature presumably petitions, communicates and promotes the organization's ideas, views, and activities. In contrast, a face-to-face oral solicitation of funds affords a greater opportunity for the exchange of ideas and views than is generally available in the distribution of literature, and the contributor in a response to a request for funds demonstrates an immediate general expression of support for the solicitor's views. Although the distribution of literature does not entail direct discourse between the solicitor and donor, the distributed literature nevertheless disseminates the views and ideas of the distributor by generally urging the recipient, in this case, the motorist, and passengers, to seek additional information, membership and contributions, etc. Thus, the nexus or common denominator between solicitation of funds and the distribution of literature is the communication of ideas, views, and the advocacy of causes.

Pursuant to prevailing legal precedent, subsection (21) would, without question, satisfy existing Supreme Court mandates of time, place, and manner regulation if it uniformly prohibited all pedestrian access to the public roadways of Kentucky, including those who seek *immediate* monetary contributions between moving or stationary vehicles using those roadways, or, in the alternative, if it uniformly accommodated all citizens seeking to express political or special interest causes by written solicitation of future contributions and by other indistinguishable expressive activity including, but not limited to, oral, visual, and written advocacy in the form of petitioning by the distribution of literature.

In the instant action, the state does not dispute that oral and written dissemination of political, religious, or other special interest advocacy are protected by the First Amendment. *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981). *See Schneider v. State*, 308 U.S. 147, 160, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939); *Lovell v. City of Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938). Nor does it claim that this protection is lost because the written materials sought to be distributed solicit contributions or are sold rather than given away, or because contributions or gifts are solicited in the course of propagating a political, religious, or other special interest. *Heffron*, 452 U.S. at 647, 101 S.Ct. at 2563.

Moreover, existing legal precedent discloses no distinction between oral, visual, or written communication that come within the orbit of First Amendment protection including the oral, visual, and written solicitation of funds, gifts, or other forms of contributions for the propagation of a cause, whatever it may be. Simply stated, the Supreme Court has recognized all oral, visual, and written communication, including oral, visual, and/or written solicitation of funds or gifts within the context of the instant case, as effectively indistinguishable means of proselytizing the members

of a selected forum entitled to equal First Amendment considerations and protections. Without exception, when the Court has considered oral, visual, and written protected expression within a hazardous environment that necessitate the time, place, and manner regulation of pedestrian and/or motor vehicular movement and activity, it has balanced the safety hazard to be assigned to the pedestrian movement and activity within the hazardous environment against a greater or lesser contributing safety factor which a legislative promulgation seeks to insure through time, place, and manner regulation of First Amendment freedoms of expressions.

Every court that has considered the comparative safety hazards and disruptions inherent to the solicitation of monetary contributions and/or the distribution of literature within an environment that mirrors the instant case has, without exception, echoed the Supreme Court's evaluations assigning greater safety risks to the face-to-face solicitation of immediate monetary contributions than to the distribution of literature.

Absent defendants' ability or effort to account for the disparate access to proselytizing accorded to the face-to-face solicitation of immediate funds as compared to oral or other forms of proselytizing, including the distribution of literature, within an identical environment and under identical precautions, it is implicit that subsection (21) of KRS 189.570 is designed to provide a contrivance for censoring expressive advocacy in a public forum and constitutes an unconstitutional infringement upon the plaintiff's, and similarly situated individual's, First Amendment rights of expressive activity.

Thus, the panel majority, even in basing its decision on the facial validity of the statute, incorrectly interprets subsection (21) to reify the statutory language so that the concepts of solicitation and distribution bear scant resemblance to the tangible activities the First Amendment was designed to protect. Both the distribution of literature and the solicitation of funds are recognized as expressive activities protected by the First Amendment. *See, e.g., Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981); *Lovell v. Griffin,* 303 U.S. 444, 450–51, 58 S.Ct. 666, 668–69, 82 L.Ed. 949 (1938). As previously stated, solicitation and distribution are constitutionally equal means of proselytizing, and the Supreme Court has considered solicitation of funds the more hazardous of the two. *See United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 3123–25, 111 L.Ed.2d 571 (1990) ("confrontation by a person asking for money disrupts passage [more] than an encounter with a person giving out information"); *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 653, 101 S.Ct. 2559, 2567, 69 L.Ed.2d 298 (1981) (solicitation of contributions more disruptive than oral advocacy because solicitation and selling require "stopping [individuals] momentarily or for longer periods as money is given or exchanged for literature"). *See also International Society for Krishna Consciousness, Inc. v. Baton Rouge,* 876 F.2d 494, 498 (5th Cir.1989) (ordinance prohibiting solicitation in roadway narrowly aimed at the "disruptive nature" of solicitation because the "[d]irect communication of ideas, including the distribution of literature to occupants in vehicles, is not restricted"); *ACORN v. City of Phoenix,* 798 F.2d 1260, 1269 (9th Cir.1986) ("The direct personal solicitation from drivers distracts them from their primary duty to watch the traffic and potential hazards in the road, observe all traffic control signals or warnings, and prepare to move through the intersection.").

Aside from refusing to distinguish between the activities of soliciting immediate monetary contributions and the distribution of literature for the purposes of applying this statute, the panel majority incorrectly and unnecessarily determines that the statute was content neutral as applied because the asserted regulatory target, the safety of pedestrians and motorists on the roadway, " 'happen[s] to be associated with that type of speech,' " i.e., the distribution of literature as opposed to the solicitation of funds. See page 1228 (quoting *Bamon*

*Corp. v. City of Dayton*, 923 F.2d 470, 473 (6th Cir.1991)). Flowing from this analytical imprecision is the panel majority's erroneous conclusion that the statute, although obviously underinclusive, passes constitutional muster because Kentucky could have prohibited all pedestrian activity on its roadways. See page 1229 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 800, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 215, 95 S.Ct. 2268, 2275, 45 L.Ed.2d 125 (1975)).[8]

Within the context of applying the content neutral test to determine the constitutionality of a statute regulating expressive activity in a public forum, the type and degree of the statute's underinclusiveness bears upon the asserted statutory aim, not the actual time, place, and manner limitations imposed by the statute. In a statute that purports to be aimed at regulating pedestrian and motorist safety on the roadways, the exclusion of one First Amendment activity from its prohibitions, i.e., solicitation of monetary contributions with warning lights, and the inclusion, within its prohibitions, of all other First Amendment activities, "raises serious doubts about whether [the state] is, in fact, serving with this statute, the significant interests which appellee invokes in support of affirmance." *The Florida Star v. B.J.F.*, 491 U.S. 524, 109 S.Ct. 2603, 2612, 105 L.Ed.2d 443 (1989). The activity excluded pursuant to subsection (21) from the prohibitions of KRS 189.570 in this case, as interpreted by the panel majority, is too similar to and more hazardous than the activity included within the statute's prohibition not to raise this doubt. See *The Florida Star v. B.J.F.*, 109 S.Ct. at 2612 (statute prohibited publication of identity of rape victim in "instrument of mass communication"; did not prohibit publication by other means, such as word of mouth).

Finally, the nature of the activity excluded from the prohibitions of KRS 189.570 strengthens this doubt: as mentioned earlier, solicitation of monetary contributions has traditionally been considered a more hazardous First Amendment activity than distribution of literature. Under the content neutral analysis, a sufficiently uncertain statutory aim will, by necessity, defeat any conclusion that the statute is narrowly tailored since the court cannot determine whether the statute "targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988); *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808–10, 104 S.Ct. 2118, 2130–32, 80 L.Ed.2d 772 (1984). Subsection (21) of KRS 189.570 obviously does not target the exact source of the evil it seeks to remedy: protecting pedestrians and motorists from the hazards inherent to Kentucky's active roadways.

The panel majority concedes that the statute is underinclusive, see page 1229, but fumbles on the conclusion that the subsection is unconstitutional because, in the majority's view, constitutionality is deter-

---

**8.** It bears noting that the cases cited by the panel majority do not support its conclusion and do not substitute for a thorough analysis of the statute's underinclusiveness.

The principle that a statute may be underinclusive and still comport with the Constitution derives from the rational relation standard of equal protection analysis. *Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). In the only case cited by the panel majority that involved a First Amendment challenge to a statute based on its underinclusiveness, the Supreme Court struck down the statute as being underinclusive in its regulation of the content of drive-in movie films. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214–15, 95 S.Ct. 2268, 2275, 45 L.Ed.2d 125 (1975). According to the Court, the underinclu-

sive principle is simply one aspect of the "presumption of statutory validity," which has "less force when a classification turns on the subject matter of expression." *Erznoznik*, 422 U.S. at 215, 95 S.Ct. at 2275.

The Supreme Court's cited discussion in *Ward v. Rock Against Racism* is entirely inapposite to the issue under review in this case because the Supreme Court was dismissing the argument that a time, place, and manner regulation must be the least intrusive *means* of achieving the asserted governmental interest. *Ward v. Rock Against Racism*, 491 U.S. 781, 794–800, 109 S.Ct. 2746, 2756–58, 105 L.Ed.2d 661 (1989). Whether a time, place, and manner regulation is impermissibly underinclusive is an entirely different inquiry from whether the means it employs are the least restrictive.

mined by an examination of "hidden motives" or "wishes" of the Kentucky legislature. See page 1229. The underinclusive inquiry does not require ferreting out the subjective hidden motives and intent of the legislature; rather, the inquiry evaluates "the *facial* underinclusiveness" of the statute. *The Florida Star v. B.J.F.*, 109 S.Ct. at 2612 (emphasis added).

Because this case challenges the constitutionality of the statute as interpreted by the chief of police, the panel majority need not have forayed into the realm of the statute's aim or the legislature's "motives." Mindful of the essentially indistinguishable similarities between the hazards to pedestrian and motorist safety inherent to distractions prompted by both the solicitation of contributions and the distribution of literature upon the roadways of Kentucky, the *interpretation* of subsection (21) of KRS 189.570 by the chief of police of Jefferson County, Kentucky *as applied* in denying Ater's request and Ater's resultant charges of First Amendment infringements should have been resolved by the panel majority by applying a content based evaluation to the statute. Contrary to the panel majority's conclusion, the application of this statute *does* "suffer from more covert forms of discrimination," see page 1227, because the chief of police has interpreted subsection (21) in a manner that vested him with the discretionary authority to exclude particular types of speech. Uniform application of the statute dictates a uniform treatment of Ater or similarly situated individuals to roadway access to distribute literature as that accorded to individuals soliciting contributions in those identical roadways under identical circumstances. Thus, the ultimate result of the statutory interpretation of subsection (21)

of KRS 189.570 in the instant action was to regulate the content of speech and the interpretation of subsection (21) by the chief of police must be judged by a content-based standard.[9]

A statute designed to regulate expressive activity, such as particular subject matter or a certain classification of speaker, is considered to be content based and subject to an exacting standard. *United States v. Kokinda*, 497 U.S. 720, 110 S.Ct. 3115, 3124–25, 111 L.Ed.2d 571 (1990); *Consolidated Edison Co. of New York v. Public Service Commission*, 447 U.S. 530, 537, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980); *Widmar v. Vincent*, 454 U.S. 263, 267–70, 102 S.Ct. 269, 273–74, 70 L.Ed.2d 440 (1981); *Daily Herald Co. v. Munro*, 838 F.2d 380, 385 (9th Cir.1988). Accordingly, the statute must address a compelling state interest and must be narrowly drawn to achieve that end. *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. at 45, 103 S.Ct. at 955 (citations omitted). *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46–47, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986) ("regulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment").

A distinction based on content may be permitted in narrow circumstances to advance a compelling state interest. *See, e.g., Lehman v. Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (city transit system did not have to accept partisan political advertising). *Cf. Schenck v. United States*, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919). Although the "authority of a municipality to impose regulations in order to assure the safety and conve-

---

9. Again, the panel majority insists that this analysis focuses on the Kentucky legislature's "motive for excepting other forms of conduct from the prohibition," See page 1232, n. 5 and that a "content-based motive cannot be logically inferred from this exception [for solicitation]," See page 1232. No motive-based inquiry is required.

Rather, the *effect* of this exception, in combination with the discretion it hands the chief of police in determining the application of this exception, is to restrict speech on the basis of

content. This nonmotive based analysis is supported by commonsense. For example, the *unpopular* speaker who brought this case had volunteered to use the rotating lights required by the section when distributing literature, but was rejected. As one might expect, and as the attorney for the plaintiff admitted during oral argument, other, more *popular* speakers have distributed literature on the Kentucky roadways, presumably without the chief of police's knowledge or permission.

nience of the people in the use of public highways" is a well-recognized significant governmental interest, *Cox v. State of New Hampshire,* 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941), there is no compelling state interest that justifies the application of subsection (21) to deny Ater, or those similarly situated, the right to distribute his literature if done within the lighting requirements of subsection (21) of the statute. Accordingly, the distinction imposed by Chief of Police Crouch was not narrowly drawn to further the purposes of the statute.

Local law enforcement officials cannot selectively designate the individuals who shall have access to the public forum, in this instance the public roadways, but must apply subsection (21) uniformly, "focusing on the abuses and dealing evenhandedly" with the presence of pedestrians on the roadways with the appropriate warning lights regardless of the content of the expressive activity. *Police Dep't of City of Chicago v. Mosley,* 408 U.S. 92, 102, 92 S.Ct. 2286, 2293, 33 L.Ed.2d 212 (1972). *See Carey v. Brown,* 447 U.S. 455, 470–71, 100 S.Ct. 2286, 2295–96, 65 L.Ed.2d 263 (1980); Stone, *Restrictions of Speech Because of its Content: The Peculiar Case of Subject–Matter Restrictions,* 46 U.Chi. L.Rev. 81 (1978). As noted by the Supreme Court, " 'under the Equal Protection Clause, not to mention the First Amendment itself,' even a traffic regulation cannot discriminate on the basis of content unless there are clear reasons for the distinctions." *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 215, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975) (quoting *Police Dep't of City of Chicago v. Mosley,* 408 U.S. at 96, 92 S.Ct. at 2290). The government "may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't of City of Chicago v. Mosley,* 408 U.S. at 96, 92 S.Ct. at 2290.

The Jefferson County police chief's exclusionary application of subsection (21) violated "the fundamental principle that a state regulation of speech should be content neutral." *Widmar v. Vincent,* 454 U.S. at 277, 102 S.Ct. at 278. On the record as presented, he has failed to justify this exclusionary application under applicable constitutional standards. Thus, subsection (21) of K.R.S. section 189.750, which prohibits Ater and those similarly situated from distributing literature on the roadways when utilizing the appropriate warning lights, violates the First Amendment and is unconstitutional.

For the reasons stated above, I respectfully dissent and the judgment of the district court granting summary judgment to Jefferson County should be reversed and the case remanded to the district court for further proceedings not inconsistent with this proposed dissent.